UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re:

NXXI, Inc., f/k/a
Nutrition 21, Inc., *et al.*,                                          Chapter 11


                                    Debtors.                          Case No. 11-23712 (RDD)


---------------------------------------------------------x
 Walgreen Co.,


                                    Plaintiff
                                                                      Adv. Pro. No. 11-08367 (RDD)

             v.

NXXI Inc., f/k/a Nutrition 21, Inc., and
Nature's Products, Inc.,


                                    Defendants
---------------------------------------------------------x

Appearances:

Lowenstein Sandler, LLP, by John K. Sherwood and Frank T. M. Catalina, for Walgreen Co.

Heller, Horowitz & Feit, P.C., by Martin Stein, for NXXI, Inc.,

Carlton Fields, P.A. by Alan Rosenthal and Natalie J. Carlos for Nature's Products, Inc.


## MEMORANDUM OF DECISION AFTER TRIAL


Robert D. Drain, United States Bankruptcy Judge

        In this adversary proceeding, plaintiff Walgreen Co. ("Walgreen") asserts chargeback

claims against two of its former vendors, defendants NXXI, Inc., f/k/a Nutrition 21, Inc., the

debtor herein ("NXXI") and Nature's Products, Inc. ("NPI") for outdated, defective and

otherwise unsalable products, as well as for merchandise it claims an absolute right to return, and

based on specific deals, such as discounts, coupons and promotional allowances.  In turn, NXXI

and NPI seek to collect invoices owed them by Walgreen, the amount of which, Walgreen

contends, is exceeded by its claimed chargebacks.  In addition, NXXI seeks to enforce NPI's

assumption, under an asset purchase agreement between NXXI and NPI, dated December 29,

2009 (the "APA"), of NXXI's obligations, if any, to Walgreen for chargebacks, and NPI asserts

a claim against NXXI for breach of the APA.

## Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§

157(a) and (b)(1) and 1334(b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).  Given

that this adversary proceeding was necessary to decide the claims of Walgreen and NPI asserted

against the chapter 11 estate of NXXI, the debtor herein, which on their face exceed the amount

of NXXI's claims against them, the Court has the power to enter a final order resolving this

adversary proceeding.  Stern v. Marshall, 131 S. Ct. 2594, 2617 (2011); Langenkamp v. Culp,

498 U.S. 42, 44 (1990).  In any event, the parties have consented to this Court's entry of such an

order.  Dynegy Danskammer, LLC v. Peabody COALTRADE Int'l Ltd., 905 F. Supp. 2d 526,

530 (S.D.N.Y. 2012); Executive Sounding Bd. Assocs. v. Advanced Mach. & Eng'g Co. (In re

Oldco M Corp.), 484 B.R. 598, 606-08, 614 (Bankr. S.D.N.Y. 2012) (Congress has not

precluded the Article III, district courts' determination of any class of cases, proceedings and

matters referred by the district courts to the Article I, bankruptcy courts; therefore, the

bankruptcy courts' exercise of jurisdiction on consent does not implicate a non-waivable,

structural constitutional right.).

## Procedural History and Resolved Issues

This Memorandum of Decision sets forth the Court's findings of fact, conclusions of law

and rulings on the remaining issues in this adversary proceeding after a three-day trial and

reflects the Court's review of the trial record[1] as well as the parties' post-trial proposed findings of fact and conclusions of law.

Certain issues were resolved before the start of the trial.

By Order dated November 26, 2012 [Doc. 134], the Court granted partial summary judgment, for the reasons stated by the Court in its bench ruling, on the parties' partial summary judgment motions[2] (1) in favor of Walgreen against NPI in the amount of $1,260,549.02, comprising (a) the so-called "authorized return" of five "branded" products by Walgreen to NPI in the amount of $1,179,559.02, and (b) a related authorized price reduction of $80,950, and (2) in favor of Walgreen against NXXI for chargebacks in the amount of $156,839.57 based on Walgreen's reason codes "DDLS, DCOU, PA, and SVCL" (deals, coupons, price adjustments based on audit and miscellaneous store claims), which were not contested by NXXI.

The Court also concluded when deciding Walgreen's motion for partial summary judgment that Ill. Comp. Stat. 5/2-210(5)[3] does not give Walgreen the right to demand, on a delegation theory, NPI's performance of Walgreen's chargebacks to NXXI based on NPI's undertaking to NXXI in the APA to assume such obligations.  Rule 56 Tr. at 82-3.  That is because the APA is, on its face, not merely or primarily a sale of goods transaction and, therefore, is outside the scope of Article 2 of the UCC.  Id.  This conclusion is also the law of the case for any other arguments premised on Article 2 of the UCC applying to claims based on the APA.

---

[1] References to trial testimony are designated as Tr. ___, if taken from live testimony at the trial held by the Court on June 10, 11 and 13, 2013; Decl. ¶___, if taken from a declaration submitted as direct testimony for the trial; and Depo. ___, if taken from deposition testimony designated as evidence at the trial.  References to the trial exhibits, from the joint exhibit book, are designated as Ex. ___.

[2] See transcript of October 15, 2012 hearing in which the Court issued its bench ruling ("Rule 56 Tr."), at 78-81.  See also Exs. 5, 34, 118, 119; Kelly Decl. ¶ 16.

[3] The parties agree, correctly, that Illinois law governs the relations of each of NPI and NXXI, on the one hand, with Walgreen, on the other.

By Order dated January 18, 2012 [Doc. 137], the Court granted partial summary judgment in favor of NXXI dismissing Walgreen's claim against it for the $1,179,559.02 "authorized return" and the related $80,950 agreed price reduction.  The Court concluded, for the reasons stated in its bench ruling on the parties' summary judgment motions,[4] that the "authorized return" and agreed price reduction were separately bargained between Walgreen and NPI and that the "authorized return" was made to NPI, not to NXXI; therefore, only NPI, and not NXXI, is liable to Walgreen for these claims.

In addition, after Walgreen closed its case on its claims, the Court granted NXXI's motion under Fed. R. Bankr. P. 7052, which incorporates Fed. R. Civ. P. 52(c), on another category of Walgreen's claims against NXXI, the so-called "expired/out-of-date" chargebacks. The Court concluded, for the reasons stated in its bench ruling on NXXI's Rule 52(c) motion,[5] that Walgreen could not establish a claim against NXXI for the chargebacks recorded by its store personnel based on allegedly expired/out-of-date inventory.  Although the Court gave a lengthy bench ruling on this point, two fundamental considerations underlie the decision.  First, Walgreen and NXXI had no meeting of the minds regarding the criteria to determine expired or out-of-date inventory that could be destroyed at the store level and charged back to NXXI. Indeed, not only did Walgreen never communicate the criteria for its "expired/out-of-date" policy to NXXI or NPI,[6] but also Walgreen internally applied inconsistent and differing criteria for "expired/out-of-date" product, ranging from the actual expiration date to 30 days, 60 days and 90 days before the actual expiration date,[7] with the distinct possibility of substantial product

---

[4] Rule 56 Tr. at 74, 77.
[5] Tr. at 190, 408-20.
[6] Walgreen's Proposed Findings of Fact and Conclusions of Law ¶ 16; Tr. at 357, 376.
[7] Tr. at 85-87, 213-14, 357; Paoli Decl. ¶ 20.

remaining on the shelves for substantial periods within 90 days of the expiration date;[8] and

Walgreen's written "unsaleables" policy specified no specific date. [9]  Second, the sole basis at

trial for Walgreen's assertion of "expired/out-of-date" chargebacks against NXXI was whether

the item was listed by Walgreen store personnel as having been taken off the shelves and

destroyed at the store level for being within 90 days of its expiration date (no lot numbers or

actual expiration dates were ever recorded by Walgreen);[10] thus, unless the Court accepted the

90-day rubric as reasonable and consistently applied, which the Court did not for the reasons

stated in its bench ruling, Walgreen had not introduced evidence of any subset of such products

that *would* fall within a reasonable and consistent "expired/out-of-date" policy.  Thus, Walgreen

failed to prove its damages beyond speculation for this category of chargebacks.

In its Rule 52(c) motion, NXXI also prevailed against Walgreen on Walgreen's claim for

$47,507.74 of chargebacks for returned products or products shipped to and destroyed at

Walgreen's distribution center.  Id. at 420-21.  Walgreen apparently conceded that it did not have

a claim under its agreements with NXXI for all but roughly $6,000[11] of this sum, but, in any

event, neither the controlling letter agreements[12] nor testimony regarding the business practices

between Walgreen and NXXI showed an agreement permitting the return or the removal to and

destruction of product at Walgreen's distribution center, as opposed to destruction at the store

level under the so-called "1506 program."  Tr. at 420-21.

For the same reasons, NPI prevailed on its own Rule 52(c) motion with respect to

Walgreen's (a) "expired/out-of-date" chargebacks and (b) the $47,507.74 claim.  Walgreen based

these claims against NPI on NPI's having assumed NXXI's obligations to Walgreen in some

---

[8] Tr. at 201-02, 210-14; Exs. 84 and 212.
[9] Tr. at 191-92.
[10] Tr. at 91-92, 183-84.
[11] Tr. at 389. In any event, this approximately $6,000 amount concededly pertained to NPI products, not NXXI products, for which Walgreen has no right to charge back NXXI.
[12] Exs. 4,5 and 6; see also Walgreen's General Trade Provisions, Ex. 2, Ex. A.; Tr. at 232-34.

manner other than NPI's undertaking to NXXI in the APA, which, for these categories of chargebacks, was not established.  Id. at 524-25, 536, 539.

Finally, the parties have waived certain claims.

Walgreen conceded that it could not establish whether $186,465 of its chargeback claims were for NXXI or NPI products, and, therefore, that it could not prove such claims against either NXXI or NPI (it appears that a substantial portion of these chargebacks also fall into the "expired/out-of date" category and, therefore, were not established, in any event, but this was a separate basis for granting both NXXI's and NPI's Rule 52(c) motions on these claims).  Id. at 421-22, 524-25.  Walgreen also conceded that it owes NXXI for unpaid invoices aggregating $504,323.51 before chargebacks ($714,041.39 minus $209,717.88 of Walgreen accounts receivable sold by NXXI to NPI under the APA)[13] and that it owes NPI for unpaid invoices, before chargebacks, aggregating $908,763.96 ($699,046.08 of post-APA open invoices plus $209,717.88 of Walgreen accounts receivable purchased by NPI from NXXI under the APA).[14]

NXXI no longer is asserting a novation theory that would relieve it of liability to Walgreen after the closing of the APA, id. at 35,[15] and no longer asserts that it changed its agreement with Walgreen on nonsalable goods from "destroy" at the store level under the "1506 program" to "return" to vendor.  Id.  at 42.  NXXI also concedes that under the APA (a) NPI purchased "about $209,000"[16] of Walgreen accounts receivable owed to NXXI, from a fungible pool of in excess of $700,000 of Walgreen receivables, and (b) that any chargeback or setoff

---

[13] Revised Ex. 30 (attached to Walgreen's "Closing Statement" submitted at oral argument); Walgreen's Proposed Findings of Fact and Conclusions of Law ¶ 63.

[14] Id.

[15] Such a claim would be unavailing, in any event, given that under Walgreen's General Trade Provisions, which NXXI agreed to, vendors remain liable to Walgreen for chargebacks, Ex. 2:  Exhibit A Conditions of Order ¶ 3, until released by Walgreen in writing, id. ¶ 8, and their agreements with Walgreen cannot be assigned without Walgreen's express written consent, id., which Walgreen never gave to NXXI. Tr. at 164.

[16] NXXI's Proposed Findings of Fact and Conclusions of Law ¶¶ 40, 54. The exact amount is $209,717.88.  Id. ¶ 59 Tr. at 703-04; Ex 31; APA ¶ 1.1(b) and APA Ex. 1.5.

claims by Walgreen against NXXI would be deducted first from the Walgreen accounts

receivable that NPI did not purchase, leaving NPI with the right to the full amount of receivables

that NPI purchased because Walgreen's valid chargebacks or setoffs do not exceed the Walgreen

receivables that NPI did not purchase under the APA.  Tr. at 325-26, 476-77, 995.  NXXI also

concedes that Walgreen is entitled to a 2 percent discount on all Walgreen accounts receivable to

NXXI and that Walgreen is entitled to a further $16,709.97 of "agreed deal" chargebacks.

NPI has waived its fraud claim against NXXI, id. at 62, as well as its rescission claim

against NXXI, id. at 83, with respect to the APA.  NPI also concedes that its claims against

Walgreen should be reduced by $36,623.36 for promotions, coupons and other discounts that it

agreed to.[17]  Finally, NPI waived any claim for approximately $1.6 million in damages in the

form of unspecified amounts that its representative, Jannie Motta, testified[18] NPI paid to NXXI's

former vendors and suppliers after the APA closed.  Tr. at 686-88.

The following sets forth the Court's findings of fact and conclusions of law with respect

to the remaining open issues in this adversary proceeding.

### Findings of Fact and Conclusions of Law

**1.**  Walgreen's Claims Against NXXI and NXXI's Claims Against Walgreen.

After taking into account all of the Court's prior rulings and the parties' concessions and

waivers, NXXI asserts that Walgreen owes it $543,981.57 of outstanding accounts receivable

after discounts and chargebacks ($732,174.60 minus a 2 percent across-the-board agreed

discount (or $14,643.49),[19] minus $156,839.57 of uncontested chargebacks previously ruled by

---

[17] Tr. at 996; NPI's Proposed Findings of Fact and Conclusions of Law ¶ 16.
[18] Motta Decl. ¶ 33.
[19] NXXI states the result of this discount incorrectly as $14,571.85.  NXXI's Proposed Findings of Fact and Conclusions of Law at 15; Ex. 45.

the Court[20] to be owed to Walgreen by NXXI, minus $16,709.97 of "agreed deal" chargebacks).
See generally Ex. 45.

    The only portions of this $543,981.57 that Walgreen disputes and that the Court has not already ruled on or that is not the result of the $71.74 mathematical error discussed in footnote 19, above, comprise (a) a $3,489.72 difference between Walgreen's open invoice exhibits[21] and NXXI's accounts receivable exhibit,[22] (b) $138,735.13 of chargebacks not based on "expired/out-of-date" product codes,[23] and (c) $159,318 of chargebacks that Walgreen had previously recorded as "expired/out-of-date" but at oral argument contended for the first time could be recharacterized as subject to chargeback or setoff on account of defective NXXI products.[24]

    Neither NXXI nor Walgreen made any attempt to explain the $3,489.72 difference in their respective exhibits.  Walgreen's accounts payable exhibit[25] was more credible than NXXI's exhibit,[26] which, in contrast to Walgreen's exhibit, appears to have been assembled after-the-fact, and NXXI offered no witness to explain how it derived its calculation of Walgreen accounts receivable, whereas Walgreen's witness explained the methodology behind its payable exhibit credibly and without any attempt by either defendant to contradict him.[27]  Therefore, NXXI's claim against Walgreen will be reduced by an additional $3,489.72.

---

[20] Rule 56 Tr. at 78-81.

[21] Ex. 1; McClure Decl. ¶¶ 20-24.

[22] Ex. 45.

[23] Ex. 24. NPI contends that this amount is only $128,271.99, but gives no support for that assertion.  NPI's Proposed Findings of Fact and Conclusions of Law ¶ 15.

[24] Tr. of Closing Arguments, dated June 28, 2013 ("Closing Arguments Tr.") at 12-25.  See Walgreen's Proposed Findings of Fact and Conclusions of Law ¶ 66 and the demonstrative summary attached as Exhibit B thereto.

[25] Ex. 1.

[26] Ex. 45.

[27] McClure Decl. ¶¶ 6, 20-24.

NXXI asserts that it is not liable to Walgreen for the $138,735.13 of chargebacks taken for reasons other than "expired/out-of-date" inventory because, it contends, Walgreen did not comply with the parties' agreement regarding "unsalable" items when it failed to notify NXXI of the chargebacks between the time it started to report them on NPI's vendor number (rather than on NXXI's vendor number) and December 2010, when Walgreen demanded payment for chargebacks from NXXI.[28]   NXXI states that if it had received timely notice of these chargebacks, it might have exercised its right to demand return of such "unsalable" products on a going forward basis rather than permit Walgreen to continue to destroy them.  However, while the "1506 policy" that clearly covered NXXI and Walgreen's relationship relating to chargebacks[29] in fact contemplated that there would be monthly notification by Walgreen of chargebacks for destroyed product, as NXXI contends,[30] Walgreen's acknowledged failure to notify should not lead to its forfeiture of these chargebacks, the underlying propriety of which is not disputed.

First, the "1506 policy" did not require *advance* notice of destruction, only monthly after-the fact notice as part of regular reporting on Walgreen's SupplierNet,[31] and NXXI has failed to show which chargebacks it would have avoided if it had exercised its right, assuming that there had been such notice, to switch from the destruction policy to a return policy.  Indeed, generally speaking, the destruction option under the "1506 program" was more favorable to vendors like NXXI than the return option, which required the vendor to pay a fee and postage and handling.[32]

Moreover, after NXXI and NPI entered into the APA on December 29, 2009, see Ex. 31, which they did not coordinate in advance with Walgreen, NXXI unilaterally ended its vendor

---

[28] Exs. 28, 29; Tr. at 40.
[29] Exs. 4-6; DiMaria Depo. at 253, 262, 265, 270.
[30] Exs. 17, 22; DiMaria Depo. at 259-61; Tr. at 177-78.
[31] DiMaria Depo. at 256, 257-58; Tr. at 87, 177-78.
[32] Paoli Decl. ¶ 14. Ex. 17, WALG03465, WALG03467.

relationship with Walgreen,[33] apparently relying on NPI's assumption of liability in ¶ 1.3(a) of the APA to protect it against Walgreen's subsequent chargebacks for products it had sold.[34]  In addition, for at least two months until NPI set up its own vendor number with Walgreen in March 2010,[35] NPI and Walgreen used NXXI's vendor number and NPI also used NXXI's account manager, Smyyth Solutions, who, theoretically, NXXI would continue to have access to, as well,[36] which should count as notice under the agreements between NXXI and Walgreen for chargebacks during that period.  Nevertheless, there is no evidence that NXXI paid any attention to Walgreen's reporting to its vendor number or asked Smyyth Solutions for information that would have revealed these chargebacks, which further supports Walgreen's contention that NXXI would not have changed its behavior to mitigate these chargebacks if Walgreen had given NXXI proper notice of them after the vendor numbers changed in March 2010.[37]  Accordingly, NXXI's claim against Walgreen should be additionally reduced by these $138,735.13 of chargebacks.

A different result applies, though, for three independent reasons, to Walgreen's claimed $159,318 of chargebacks that Walgreen contended during post-trial argument should be recharacterized from the "expired/out-of-date" reason code to a "defective product" reason code to reflect Walgreen's position that the NXXI product at issue, Advanced Joint Relief ("AJR"), was uniformly defective.  Closing Tr. at 12-25.

---

[33] Minger Decl. ¶¶ 45-55; Ex. 8; Ex. 9 at WALG03160.
[34] Ex. 31 (APA) ¶ 1.3(a).
[35] Ex. 115, 115; Tr. at 43-44.  After the vendor numbers changed, NXXI ceased having access to Walgreen's posting of chargebacks.  Tr. at 45-46, 178-79, 181; see also Ex. 142.
[36] Tr. at 599-600; Metzger Depo. at 82-83, 105-06.
[37] Tr. at 321.

First, Fed. R. Bankr. P. 7015, which incorporates Fed. R. Civ. P. 15(b), does not permit

Walgreen to change its theory of this part of its case at post-trial argument.[38]   Clearly NXXI did

not expressly consent to Walgreen's change of theory, and there was no implicit consent for

purposes of Rule 15(b)(2).   *NPI* attempted during the trial to show that AJR, or, more

specifically, the product's capsule, was defective, but that effort was directed at proving NPI's

claim that NXXI breached a representation to it in the APA.   Thus, NXXI could not be said to

have recognized, let alone implicitly consented, that the new basis for Walgreen's $159,318

chargeback claim was at issue when such evidence was introduced.   Grand Light & Supply Co.

Inc. v. Honeywell Inc., 771 F.2d 672, 680 (2d Cir. 1985) (purpose of Rule 15(b) is to allow

pleadings to conform to issues actually tried, not to extend pleadings to issues inferentially

suggested by evidence in the record); 3 James Wm. Moore et al., Moore's Federal. Practice ¶

15.18[1] (3d ed. 2013) at 15-90 ("A court may not find consent when evidence supporting an

issue allegedly tried by implied consent is also relevant to other issues actually pleaded and

tried.").  See also United States v. 890 Noyac Rd., 945 F.2d 1252, 1257 (2d Cir. 1991) .

By its terms, Rule 15(b)(1) also is unavailable, because NXXI has shown that Walgreen's

belated use of evidence on AJR to establish the propriety of these recharacterized chargebacks

would prejudice NXXI's defense.   Such prejudice is brought home by the fact that NXXI's

primary, and dispositive, defense to NPI's AJR-related breach of contract claim was that, even if

some of the AJR product was defective, a point that NXXI did not concede, NXXI could show

that NPI did not experience any damages in light of the fact that another company, High

Performance Fitness ("HPF"), paid Walgreen approximately $1.2 million for all of the AJR

product that Walgreen identified and, therefore, Walgreen did not have any chargebacks to NPI

---

[38] That Walgreen's theory changed after the trial is clear.  See Tr. at 48, testimony of Walgreen's first witness Scott Minger:  Q:  "And Walgreens is not making a claim against either [NXXI] or NPI in this action for AJR, is it?"  A:  "That's correct."

attributable to AJR.  Tr. at 113; Ex. 113; McClure Decl. ¶¶ 29-30.  Thus, until Walgreen

introduced its new theory at post-trial argument, NXXI did not need to contest the validity of

Walgreen's post-APA recall of AJR.

Second, there is no evidence that Walgreen ever notified NXXI of its post-APA recall of

AJR[39] (which, as discussed above, HPF's agreement to purchase the AJR product from Walgreen

mooted) until at least seven months after the recall, or that NXXI had the opportunity to contest

the recall notwithstanding that Walgreen's policy (a) contemplated such a right, Tr. at 48-49; Ex.

17 at WALG3465, Ex. 18, as well as (b) Walgreen's return to the vendor of the recalled product

in its possession, which also did not happen in this case.  Id.).[40] These failures and their

prejudice to NXXI differ materially from Walgreen's failure to provide regular, after-the-fact

notice to NXXI of "1506 program" product destruction, discussed above.  Until HPF paid to take

the AJR product off of Walgreen's hands, the AJR recall promised to impose substantial cost on,

and in all likelihood would have been disputed by, NXXI, which HPF's purchase and the

destruction of the $159,318 of product now at issue effectively nipped in the bud.  Thus,

Walgreen should be precluded from belatedly raising the issue after the AJR product had been

sold to HPF or -- with respect to the $159,318 of chargebacks belatedly attributed by Walgreen

to defective AJR product -- destroyed.

Last, even were it permitted to borrow NPI's evidence, Walgreen failed to establish that

NXXI sold it a materially defective AJR product such that every AJR capsule would be deemed

unsalable, the basis for Walgreen's new, post-trial theory.  Evidence that AJR's capsules actually

were sufficiently defective to support Walgreen's post-APA recall was not admitted against

---

[39] Tr. at 49-50.
[40] Of course, these particular chargebacks actually were not part of the recall, having been
separately scanned by Walgreen personnel under a different, "expired/out-of-date" code.  Closing Tr. at
14.

NXXI, Tr. at 145, 562-63 (Exs. 35, 135, referencing NPI's analysis of AJR, not admitted against

NXXI), nor was any evidence of post-APA customer complaints pertaining to AJR.[41]  There

were two pre-APA complaints by Walgreen regarding sticky AJR capsules, but none after May

2009, Sundell Decl. ¶ 8; Tr. at 574-75, 581; Ex. 102, while the APA was entered into on

December 29, 2009, Ex. 31 (NXXI having sold AJR product to Walgreen during the intervening

seven months without complaint), and Walgreen started to implement its AJR recall only in late

April or early May 2010, another four months later.  Exs. 13, 35; Minger Decl. ¶ 56.  In response

to the pre-APA complaints, NXXI did a limited quality check on the product and decided that

reports of AJR's sticky capsules were most likely attributable to how bottles were stored, Exs.

86, 96, 101, 102; see also Sundell Decl. ¶ 8, Tr. at 559.  Although at trial Mr. Sundell, who

performed the tests, stated that the capsules should have been reformulated, Tr. at 581-82, on the

other hand, he credibly denied that NXXI had "ongoing, persistent quality problems with IHJR

and AJR from October 2008 up through the sale pursuant to the [APA] on December 29, 2009."

Tr. at 548-49; see also id. at 557, 561, 568, where Mr. Sundell testified that any problems

between NXXI and Walgreen with respect to IHJR or AJR were typical of products with similar

sales.  Again, before the APA, Walgreen never implemented a recall of any product sold by

NXXI nor discontinued buying any product from NXXI because of customer complaints,[42] and

after May 2009 and at least until late April or early May 2010, any concerns that Walgreen may

---

[41] Evidence of pre-APA customer complaints regarding another product, Iceland Health Joint
Relief ("IHJR"), was admitted against NXXI, Exs. 87, 201; Tr. at 564, but no specific post-APA complaints
about IHJR were identified, either.  Walgreen made two complaints about IHJR in 2008 and March or
April of 2009, several months before the APA, and NXXI did a quality investigation from which it
concluded that the capsule problems were caused by improper storage conditions.  Sundell Decl. ¶ 7; Tr.
at 550, 564, 571.  Neither NPI nor Walgreen introduced sufficient evidence showing claims against NXXI
based on quality problems with IHRJ, however, Motta Decl. 32; Ex. 114 (both of which refer only to AJR),
and, in any event, Iceland Health products were not sold to NPI under the APA.  Ex. 31:  APA page 1,
second "whereas" clause.

[42] Sundell Decl. ¶ 9; Tr. at 100-01, 580-81.  At some unspecified time before the AJR issue arose
in May 2009, Walgreen apparently put NXXI on probation for an unspecified time for unspecified quality
and logistics issues related to some unspecified private label product, not AJR, which apparently did not
continue after at least March 2009. Tr. at 143, 174-75, 578-79; Ex. 94.

have had about AJR abated; there were no further Walgreen complaints about either AJR or

other NXXI products.[43]  Finally, any NPI/Walgreen dispute regarding the April/May 2010 AJR

recall was aborted in light of HPF's purchase, for approximately $1.2 million, in May 2010[44] of

"defective" AJR product identified by Walgreen (while after Walgreen's recall notice and prior

to that purchase neither NPI nor Walgreen, which ceased to deal with NXXI after the closing of

the APA, accused NXXI of selling a defective AJR product.  Tr. at 41, 665-68; Sundell Decl. ¶

10).  Given all of the foregoing, Walgreen failed to carry its burden that the $159,318 of

recharacterized chargebacks for goods which it did not sell to HPF apparently only because

Walgreen's personnel scanned them as "expired/out-of-date" instead of "defective" were

attributable to an AJR product that was uniformly unsalable.

Accordingly, on a net basis, after taking into account all of its valid chargebacks against

NXXI, Walgreen owes NXXI $401,684.98; in addition, Walgreen owes $209,717.88 of

Walgreen accounts receivable sold by NXXI to NPI under the APA.

   **2.**   <u>Walgreen's Claims Against NPI and NPI's Claims Against Walgreen.</u>

After taking into account the Court's prior rulings in favor of Walgreen against NPI on

the "authorized return" and the related $80,950 price reduction, the Court's summary judgment

ruling in favor of NPI against Walgreen on Walgreen's delegation theory under the Illinois UCC,

the Court's Rule 52(c) ruling in favor of NPI against Walgreen on various chargeoffs, and NPI

and Walgreen's waivers and concessions regarding their remaining claims against each other,

Walgreen and NPI have a $24,420.42 dispute over the amounts Walgreen owes NPI before

chargebacks.[45]  As noted above, Walgreen acknowledges that, before chargebacks, Walgreen

---

[43] Sundell Decl. ¶¶ 7-8; Tr. at 575, 581.
[44] Tr. at 113; Ex. 113.
[45] Walgreen acknowledges that Walgreen and NPI "did not enter into new agreements following
the APA that specifically addressed Walgreen's 1506 program," Walgreen's Proposed Findings of Fact

owes NPI $699,046.08 plus the $209,717.88 of Walgreen accounts receivable purchased by NPI

from NXXI under the APA, for a total of $908,763.96.[46]  NPI, on the other hand, contends that,

with the $209,717.88, Walgreen owes it $935,184.38 (after taking into account the 2 percent

discount that NPI apparently accepts it agreed to, although Ms. Motta's original calculations on

behalf of NPI did not apply it).[47]  Also as noted above, the Court has already ruled that NPI owes

Walgreen $1,179,599.02 for the "authorized return," and $80,950 for the related agreed price

reduction, NPI has conceded $36,623 of valid chargebacks against it, and the Court has

previously ruled that Walgreen has no other valid chargebacks against NPI.

Although Walgreen's Mr. McLure relied almost entirely on the accuracy of Walgreen's

systems for recording accounts payable and chargebacks, rather than on his personal

knowledge,[48] Walgreen's exhibits and Mr. McLure's testimony regarding the $24,420.42 invoice

dispute are more reliable than NPI's exhibits and witness, Ms. Motta.  NPI's calculation of the

---

and Conclusions of Law at 18 ¶ 8; see also Tr. at 126-27, and the "1506 program" was the sole basis for
Walgreen's $138,735.13 of chargebacks against NXXI for reasons other than "expired/out-of-date"
inventory.  Nevertheless, Walgreen's Proposed Findings of Fact and Conclusions of Law continues to
assert that NPI is jointly and severally liable to it for the $138,735.13 based solely on its UCC delegation
theory, id., on which the Court previously granted NPI summary judgment, which means that NPI is not
directly liable to Walgreen for these $138,735.13 of chargebacks.
      Even were Walgreen to allege NPI's liability to it for these chargebacks on a course of
performance theory, the evidence shows that, with the exception of the most basic payment terms and
specifically negotiated agreements such as the "authorized return" and certain promotions, Walgreen and
NPI were still working out their relationship during the period between January 2010 when they started
doing business after the closing of the APA and the first week of May 2010 when they stopped doing
business together.  See e.g., Ex. 10 (February 25, 2010 NPI presentation on possible business terms
between the parties); Tr. at 112-13, 115-28, 140, 605-06, 622, 681-82.  They never performed in a way
that clearly implemented the "1506 program."  Id.; see also Kelly Decl. ¶¶ 9, 11, 13-15, 22.  There is no
evidence of statements by NPI to Walgreen than NPI had actually assumed all of N21's post-APA
obligations to Walgreen, including those under the "1506 program," notwithstanding artful implications to
the contrary in ¶¶ 35-37 of Walgreen's Proposed Findings of Fact and Conclusions of Law.  Tr. at 116-17
(Walgreen's Scott Minger only inferred NPI's implicit agreement to "1506 program"); Tr. at 239-41
(Walgreen's Desiree Paoli acknowledges that a vendor's participation in the "1506 program" is a matter to
be negotiated, although if there is no agreement Walgreen nevertheless internally implements the "1506
program").  While NPI was aware at least in February 2010 that Walgreen was posting chargebacks
under the "1506 program" category, see Exs. 39 and 40 and Motta Depo. 205-06, the vast majority of
chargebacks were not posted until after the parties stopped doing business and cannot be said to have
been agreed by NPI's prior performance.
      [46] Walgreen's Proposed Findings of Fact and Conclusions of Law ¶ 63.
      [47] NPI's Proposed Findings of Fact and Conclusions of Law ¶ 17.
      [48] Tr. at 278, 294-95, 303-04, 327.

amount owed it are derived from an internally generated composite calculation of NXXI and

NPI's invoices taken from an internally generated accounts receivable aging report, Ex. 139, and

another internally generated account summary, Ex. 38.[49]  Walgreen's calculation not only is

taken from its open activity report, Ex. 1, which reflects all open invoices and chargebacks and

was available in real time to vendors through Walgreen's web portal, SupplierNet, McClure

Decl. ¶¶ 6-7; Tr. at 317-21, 324-25, but also Ms. Motta acknowledged that her calculations on

behalf of NPI did not reflect, as Ex. 1 apparently does, adjustments for discrepancies between

what NPI invoiced to Walgreen and the products that Walgreen actually received.  Tr. at 705,

709-10.  This is so even though Ms. Motta acknowledged that other documents generated by NPI

and its account manager, Smyyth, reflected many such adjustments.  Id. at 706-13; see also Exs.

40 and 80 at SYM00005-06.  As discussed in greater detail below, moreover, the Court found

Ms. Motta's testimony on the whole frequently self-serving, verging on untruthful; her attempts

to brush away the adjustment issues from which the $24,420.42 discrepancy apparently derives

were not credible.

 Accordingly, the Court finds and concludes that Walgreen owes NPI $908,763.96,

including the $209,717.88 that NPI purchased from NXXI under the APA, which may be set off

against the $1,297,172.02 that the Court has found (or, in the case of the $36,623 of chargebacks,

NPI agrees) NPI owes Walgreen.

 **3.** NPI's Claims Against NXXI and NXXI's Claims Against NPI.

 NPI and NXXI's claims against each other arise under the APA, which is governed by

Florida law without regard to Florida's choice of law principles.[50]  Florida applies standard

contract interpretation principles.  "[W]hen the terms of a voluntary contract are clear and

---

[49] Motta Decl. ¶¶ 28-30; see also Tr. at 701-02.
[50] Ex. 31: APA ¶ 12.6.

unambiguous, the contracting parties are bound by those terms, and a court is powerless to

rewrite the contract to make it more reasonable or advantageous for one of the contracting

parties.  To determine if a contract is ambiguous, the court is required to look to the words used,

as those words are the best evidence of the intent of the parties, and the plain meaning of that

language controls.  Every provision of a contract must be given effect and the court must

reconcile any inconsistencies if possible."  Air Caledonie Int'l v. AAR Parts Trading, Inc., 315 F.

Supp. 2d 1319, 1335 (S.D. Fla. 2004) (internal quotations and citations omitted).

NXXI claims that NPI is liable to it under APA ¶ 1.3(a) for (i) $16,709.97 of "agreed

deal" chargebacks and (ii) any post-APA chargebacks for which NXXI is liable to Walgreen,

which the Court has found to be $138,735.13,[51] aggregating $155,445.10.  APA ¶ 1.3(a) states in

relevant part:

> [NPI] shall assume (i) [NXXI's] trade accounts payable for the Business as of
> the Closing, specifically excluding payables which are subject to litigation against
> [NXXI], (ii) present and future obligations of [NXXI] under the Assigned
> Contracts, (iii) *and any existing or future claims by retailers for returns and
> allowances, charge backs, 'unsalables' and promotional allowances, or
> equivalent deductions or charges however called, whether known or unknown* and
> (iv) any future product liability claims in respect of any Product sold by [NPI]
> after Closing excluding sale of [NXXI's] existing Inventory sold and delivered to
> [NPI] hereunder (collectively, "Assumed Liabilities").

(emphasis added).  The word "and" commencing clause (iii) of APA ¶ 1.3(a) makes it clear that

the exclusion appearing at the end of clause (iv) APA ¶ 1.3(a) applies only to that clause, which

is introduced by its own "and".  Moreover, under the "last antecedent" rule, the exclusionary, or

limiting phrase in clause (iv) of APA ¶ 1.3(a) applies only to the phrase immediately preceding

it, not to clauses (i) through (iii).  Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V., 651

F.3d 329, 335 (2d Cir. 2011) (when not preceded by a comma, "[u]nder the rule of the last

antecedent, a limiting clause or phrase should ordinarily be read as modifying only the noun or

---

[51] Exs.1, 24.

phrase that it immediately follows.") (internal quotations and citations omitted).  Finally, the

exclusionary phrase in clause (iv) of APA ¶1.3(a) could not apply to clauses (i) and (ii) of that

paragraph.  Thus, the plain meaning of APA ¶ 1.3(a), taking into account all of its provisions,

establishes NPI's liability to assume, for NXXI's benefit, all of Walgreen's post-APA

chargebacks against NXXI.[52]

In addition to asserting NPI's liability under APA ¶ 1.3(a), NXXI contends that, under

APA ¶ 10.2, NPI is liable to it for NXXI's attorney's fees and expenses incurred while defending

itself against Walgreen's chargeback claims that NPI did not pay under APA ¶ 1.3(a), in an

amount to be determined later.[53]  APA ¶ 10.2 states in relevant part:

> Buyer agrees to indemnify, defend and hold harmless, Seller . . . at all
> times against and in respect of all losses, liabilities, obligations, damages,
> deficiencies, actions, suits, proceedings, demands, assessments, orders,
> judgments, costs and expenses (including the reasonable fees, disbursements and
> expenses of attorneys and consultants), of any kind or nature whatsoever, to the
> extent sustained, suffered or incurred by or made against any Seller . . . to the
> extent based upon, arising out of or in connection with: . . . (ii) any breach of any
> covenant or agreement made by Buyer in this Agreement . . . .

As discussed below, NPI asserts that any claims that NXXI has against it under ¶¶ 1.3(a)

or 10.2 are offset by NPI's claims against NXXI for breach of the APA.  Apart from this

argument, however, NXXI's indemnification claim for attorneys' fees and expenses fails because

NXXI did not show that it complied with the other provisions of the APA pertaining to such a

claim.  For example, NXXI did not establish by a preponderance of the evidence that it made a

written claim for such indemnification before the second anniversary of the December 29, 2009

closing date under the APA, as required by APA ¶ 10.3.  Nor did it introduce any evidence of an

---

[52] Even if APA ¶ 1.3(a) were found to be ambiguous, Jose Minksi of NPI, who was NPI's primary negotiator of the APA (Kelly Decl. ¶ 5), testified that the chargebacks assumed by NPI under that paragraph included chargebacks for inventory sold to NPI under the APA.  Miski Depo. at 48.

[53] NXXI's Proposed Findings of Fact and Conclusions of Law ¶¶ 25-31; Closing Arguments Tr. at 116.

opinion by NXXI's counsel that (i) there was a conflict of interest between NPI and NXXI in the conduct or defense of its claims, or (ii) there were specific defenses available to NXXI which were different from or additional to those available to NPI that may have created a conflict of interest such that it would be inappropriate for counsel to NPI to represent NXXI in the litigation of Walgreen's chargeback claims, which was required by APA ¶ 10.4(b) before NXXI would be relieved of paying for its own counsel.[54]

Before considering NPI's setoff claims based on NXXI's asserted breaches of the APA, therefore, NPI is not liable to NXXI for NXIII's attorney's fees and costs under APA ¶ 10.2 but is liable to NXXI under APA ¶ 1.3(a) in the amount of $155,445.10 for post-APA Walgreen chargebacks against NXXI.

As noted, however, NPI argues that any obligation that it has to NXXI under in APA ¶ 1.3(a) is offset by its damages for a number of NXXI's asserted breaches of the APA; indeed, NPI asserts that NXXI owes it substantially more damages for NXXI's alleged breaches of the APA than NXXI's claim against NPI under APA ¶ 1.3(a).  NPI bears the burden on both its affirmative case and its defense that NXXI breached the APA.  Air Caledonie Int'l, 315 F. Supp. 2d at 1335; Ferry-Morse Seed Co. v. Hitchcock, 426 So. 2d 958, 961 (Fla. 1982).  Before turning to whether NXXI in fact breached the APA,[55] though, it is worth considering whether NPI has established any damages arising from such claims.

---

[54] The interests of NPI and NXXI were aligned in many, and perhaps all, of their defenses to Walgreen's post-APA chargeback claims, which highlights both the importance of APA ¶ 10.4(b)'s requirement of a counsel's opinion that sorts through the conflict issue, as well as the difficulty of segregating any of NXXI's legal fees and expenses that could properly be charged to NPI under NXXI's theory (since the Court has found NXXI ultimately to be liable for only a small fraction of Walgreen's claimed post-APA chargebacks).

[55] Under Florida law, "The elements of an action for breach of contract are; (1) the existence of a contract, (2) breach of the contract, and (3) damages resulting from the breach."  Rollins Inc. v. Butland, 951 So. 2d 860, 876 (Fla. Dist. App. 2006), reh'g den. 2007 Fla. App. LEXIS 979 (Fla. Dist. App. Jan. 2, 2007), rev. den. 962 So. 2d 335 (Fla. 2007).

Under Florida law, "a breach without more only entitles the non-breaching party to nominal damages." Air Caledonie Int'l, 315 F. Supp. 2d at 1337. NPI's damages theories have been clarified during the course of this proceeding. Originally it appeared that NPI was asserting contract breach damages against NXXI in the amount of $3,650,850,[56] comprising (1) "all chargebacks claimed by Walgreens for product sold to it by [NXXI], including $1,179,599.02 for the return of the canceled products[57] -- less $156,839.57 in pre-closing chargebacks [NXXI] has been ordered to pay to Walgreens," plus (2) "$1,002,168.50 in unsalable Walgreens inventory," plus (3) "$1.6 million in accounts payable NPI paid to [NXXI's] former vendors and suppliers as a result of the APA." Motta Decl. ¶ 33.[58]

However, as noted above, during the trial Walgreen waived any claim for the alleged $1.6 million paid by NPI to NXXI's former vendors. Tr. at 686-88. Moreover, although Ms. Motta included the "authorized return" of $1,179,599.02 in her $3,650,850 damages calculation, Motta Decl. ¶ 33, and presumably also would have included the related $80,000 agreed price reduction, the Court has already found that NPI separately and independently agreed to these amounts, accepting the return of the underlying goods to it, and, therefore, is independently liable for them, whereas NXXI did not agree to or receive the return and therefore is not liable for it. It simply cannot be said that NXXI caused NPI's agreement to these amounts. See page 4, infra. Thus, after NPI's waiver of the $1.6 million claim and the Court's ruling on the "authorized return" and agreed price reduction, NPI asserts damages only for $1,002,168.50 for allegedly unsalable inventory.[59]

---

[56] This was asserted notwithstanding APA ¶ 10.1, which caps NPI's damages for NXXI's breach of the APA at $1 million.

[57] This refers to the "authorized return" previously addressed by the Court.

[58] As with much of Ms. Motta's testimony, these numbers do not add up, but the Court will analyze them by category.

[59] During the trial, it appeared that NPI might be attempting to establish that it also had a breach claim against NXXI for up to $1.8 million of unspecified and previously undisclosed chargebacks from

Walgreen's remaining $1,000,168.50 damages claim for "unsalable inventory" is not sustainable under Florida law, however.  It is important to recognize, first, that NPI claims that this inventory was unsalable not because it was defective, but, rather, because it could not be sold after NPI ceased doing business with Walgreen. Tr. at 816-18.[60]  Thus, to establish damages against NXXI for this "unsalable inventory" NPI had to prove by a preponderance of the evidence that NXXI's alleged breach was the proximate cause of NPI's ceasing to do business with Walgreen, or, more accurately, that it was the proximate cause of the failure of NPI and Walgreen to enter into a long-term business relationship. Crowley Am. Transp., Inc. v. Richard Sewing Mach. Co., 172 F.3d 781, 784 (11th Cir. 1999) (under Florida law, "A party cannot recover damages for breach of contract unless it can prove that the damages were proximately caused by the breach."). See also Gonzalez v. Garcia, 913 So. 2d 735, 736 (Fla. Dist. Ct. App. 2005); Scott v. Rolling Hills Place Inc., 688 So. 2d 937, 939 (Fla. Dist. Ct. App. 1996); Air Caledonie Int'l, 315 F. Supp. 2d at 1337.  The "general rule [in Florida] governing damages in contract cases is derived from the holding of the old English case of Hadley v. Baxendale that the damages recoverable for a breach of contract are those that flow naturally from the breach and were foreseeable by the breaching party at the time the contract was made." Henry Trawick, Jr., 5 Fla. Practice & Procedure, § 27:6 (2014 ed.); Capital Envtl. Servs. Inc. v. Earth Tech, Inc., 25 So. 3d 593, 596 (Fla. Dist. App. 2009), reh'g den. 2010 Fla. App. LEXIS 1525 (Fla. Dist. App. Jan. 14, 2010) ("Damages are foreseeable if they are the 'proximate and usual consequence of the breaching party's act.") (internal citations omitted; emphasis in the

---

other customers, Tr. at 870, but it has not asserted such a claim in its Proposed Findings of Fact and Conclusions of Law.  It also has asserted that it was damaged in purchasing $209,717.88 of Walgreen accounts receivable to NXXI under the APA.  See NPI's Proposed Findings of Fact and Conclusions of Law ¶ 69, pages 26 and 28.  As found above, however, NXXI's net claim against Walgreen is large enough so that this $209,717.88 sum will be paid by Walgreen to NPI, thus precluding any damage claim by NPI against NXXI based on such purchase.

[60] Ms. Motta acknowledged that none of the inventory represented products returned by Walgreen as defective.  Tr. at 822-23.

original); <u>Tardif v. People for the Ethical Treatment of Animals</u>, 829 F. Supp. 2d 1219, 1234

(M.D. Fla. 2011), <u>reconsideration granted in part</u> 2011 U.S. Dist. LEXIs 138095 (M.D. Fla. Dec.

1, 2011) ("Defendant is not liable when a separate force or action is the active and efficient

intervening cause, the sole proximate cause or an independent cause of the plaintiff's

damages.").

      NPI analogizes its "unsalable inventory" damages claim to a claim for lost profits

damages, <u>see</u> Walgreen's Proposed Findings of Fact and Conclusions of Law at 25-27, which

"like all damages [under Florida contract law], cannot be speculative and must be proved with

reasonable certainty." <u>Nebula Glass Int'l, Inc. v. Reichhold, Inc.</u>, 454 F.3d 1203, 1213 (11th Cir.

2006). Here, however, unlike in <u>Nebula Glass</u>, NPI has not offered sufficient evidence to show

that NXXI's alleged breaches of the APA proximately caused NPI not to form a long-term

relationship with Walgreen. The evidence showed, instead, that NPI and Walgreen did not enter

into a lasting business relationship for two primary reasons. First, NPI's competitor, HPF, was

prepared to *pay Walgreen* over $1.2 million for the AJR, Ex. 113; Tr. at 113, plus *another*

$1,050,000, to wrest Walgreen's business away on a committed basis for 36 months, Exs. 76 ¶ 2,

163; Tr. at 103, 154. This aggregate investment by HPF was greater that NPI's minimum

adjusted purchase price under the APA.[61] Second, NPI and Walgreen's negotiations broke down

primarily over NPI's insistence that Walgreen agree to a long-term guaranteed volume of sales

(whereas HPF was prepared to pay more than $2,250,000 to Walgreen merely for the right to be

Walgreen's exclusive supplier based on current ordinary course levels of demand. Exs . 76, 113,

163.). As stated by Walgreen's Mr. Minger, "I had every intention and every desire to keep the

business within NPI and we were very close to an agreement. At the end of the day, we couldn't

agree to guarantee certain volumes. We could guarantee the number of products NPI would

---

[61] Ex. 31:  APA ¶ ¶ 1.5, 7.3

have, but I was not allowed to guarantee certain volumes." Tr. at 151. It is clear that NPI

entered into the APA knowing that NXXI was in a distressed position, id. at 673, 727, 729, that

Walgreen had put NXXI on payment hold, id. at 692, 729, 735-36, and that NXXI's most recent

10-K had a going concern qualification. Id. at 750-51. In other words, NPI had a lot of work to

do to foster and improve the relationship with Walgreen that it hoped to begin from NXXI's

former platform; as agreed by NPI's Mr. Kelly, NPI had "inherited a messy situation from

[NXXI] vis-à-vis Walgreens" and "knew that given that situation, it was not going to sort of get

through and turn the corner unscathed." Id. at 607. In the four months after the closing of the

APA during which NPI and Walgreen tried to work out the terms of their new relationship,

which, of course, was thrust on Walgreen without notice, let alone preparation, the parties simply

were not able to agree to terms that made commercial sense to each other.

Ms. Motta testified to her belief that the amount of allegedly undisclosed chargebacks

generally would make it difficult for NPI to continue to do business with NXXI's former large

customers, id. at 842-43; see also Motta Decl. at ¶¶ 25, 32, presumably including Walgreen, but

she also acknowledged that she was not actually involved in NPI's discussions with Walgreen

regarding the relationship and that she did not really know why the relationship with Walgreen

never became a lasting one. Tr. at 818-19. NPI's Mr. Kelly, who *was* at the center of those

discussions, testified that Walgreen's recall of AJR made the discussions more difficult and was

one of the causes of the parties' failure to reach a long-term agreement, id. at 616-17, but he also

confirmed Mr. Minger's view, id. at 151, that the parties' negotiations broke down largely over

NPI's guaranteed volume demand, id. at 622-23, something that, like HPF's willingness to throw

money at Walgreen to obtain the business, NXXI could not have reasonably foreseen when it

entered into the APA. Therefore, NPI has not established that any breach of the APA by NXXI

proximately caused the failure of NPI and Walgreen to develop a lasting business relationship.[62]

See, e.g., Alphamed Pharms. Corp. v. Arriva Pharms., Inc., 432 F. Supp. 2d 1319, 1339-40,

1344-45, 1147 (S.D. Fla. 2006), aff'd 294 Fed. Appx. 501 (11th Cir. 2018) (proximate cause not

shown for damages derived from loss of new, future business); Brough v. Imperial Sterling Ltd.,

297 F.3d 1172, 1177 (11th Cir. 2002) (same); Douglass Fertilizers & Chem., Inc. v. McClung

Landscaping, Inc., 459 So. 2d 335, 337 (Fla. Dist. Ct. App. 1984) (same). See generally

Sunshine Bottling Co. v. Tropicana Prods., Inc., 757 So. 2d 1231, 1233 (Fla. Dist. Ct. App.

2000).

    In addition, and as a separate basis for denying NPI's remaining damage claim, NPI has

not established that its "unsalable inventory" damages can be reasonably determined (even if, as

the Court has declined to find, they were proximately caused by NXXI's breach of the APA),

which is an independent requirement under Florida law. Nebula Glass Int'l, 454 F.3d at 1217;

Slip-N-Slide Records, Inc. v. TVT Records, LLC, 2007 U.S. Dist. LEXIS 80788, at *33-36 (S.D.

Fla. Oct. 31, 2007); W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd., 545 So. 2d 1348,

1350-51 (Fla. 1989). But for the litigants' implicit agreement, in light of the Court's pre-trial

order, to the admissibility of NPI's Ex. 114 -- the sole basis for NPI's calculation of its

$1,000,168.50 "unsalable inventory" claim -- Ex. 114 would be inadmissible, Tr. at 829-30, and,

even though admitted, it is wholly unreliable. It was prepared for litigation purposes as a

summary by Ms. Motta, whose testimony the Court has found generally not to be credible, in late

2011 or 2012, years after the APA closed. Tr. at 816. Ms. Motta acknowledged that her

damages summary includes inventory manufactured by NPI, as opposed to by NXXI, and she

was unable to break out the amount attributable to NXXI from that manufactured by NPI. Id. at

---

[62] Nor did Mr. Kelly, like Ms. Motta, attribute Walgreen's chargebacks (except as they related to the aborted AJR recall, which was solved by HPF's willingness to pay for AJR when NPI would not) as a cause of the failure of NPI and Walgreen to agree on a long-term relationship.

819-20.  Moreover, Ms. Motta could not identify the source of the information summarized in
Ex. 114 with any specificity, NPI destroyed the inventory at issue before it could be inspected by
NXXI, NPI did not have lot numbers with cost information substantiating the identity or value of
the inventory, and it is not clear whether Ex. 114 reflects inventory that always remained with
NPI or that merely was on NPI's shelves at some time.  Id. at 824-26.  The reliability issues
stemming from these facts are especially telling given that NPI chose to stop filling orders from
Walgreen in April or May 2010, Tr. at 674-75, and in May 2010 HPF approached NPI to
purchase at least a portion, and perhaps a substantial portion, of the inventory ostensibly
earmarked for Walgreen, id. at 632-34, apparently because HPF wanted to sell it to its new
customer.  Essentially, therefore, Ex. 114, the only source for quantifying NPI's "unsalable
inventory" claim, cannot be relied upon, and without it NPI cannot prove its remaining damages
with reasonable certainty.[63]

Because NPI is unable to prove its claimed damages, it is moot whether NXXI breached
its representations and warranties in APA ¶¶ 2.10 (stating that there are no chargebacks that are
not disclosed and adequately reserved against on the NXXI's Basic Balance Sheet, to NXXI's
knowledge), 2.11 (stating that no material adverse change has occurred since the Basic Balance
Sheet Date), 2.13 (stating that NXXI's relations with customers are good, and that Schedule 2.13
lists, to the best of NXXI's knowledge, existing or future claims for chargebacks and unsalables),

---

[63] The evidence regarding HPF's offer to purchase "Walgreen" inventory from NPI also raises the
question whether NPI complied with Florida contract law's principle of "avoidable consequences," often
equated with mitigation (although there is no Florida law "duty" to mitigate). System Components Corp. v.
Florida Dept. of Transp., 14 So. 3d 967, 982 (Fla. 2009); Graphic Assocs., Inc. v. Riviana Rest. Corp.,
461 So. 2d 1011, 1014 (Fla. Dist. Ct. App. 1984); Jenkins v. Graham, 237 So. 2d 330, 333 (Fla. Dist. Ct.
App. 1970); see also Tampa Pipeline Transp. Co. v. Chase Manhattan Serv. Corp., 928 F. Supp. 1568,
1579 (M.D. Fla. 1995).

and 2.14 (stating that the sold inventory is merchantable and fit for the purpose for which it was procured of manufactured and is not damaged or defective), as NPI claims.[64]

Nevertheless, two points regarding NPI's breach claims are worth making.  The first is relevant because it goes to Ms. Motta's lack of credibility.  She contended that a purchase price schedule, Exhibit 1.5 to the APA, constituted NXXI's representation and warranty that there were no undisclosed Walgreen chargebacks, but, to the contrary (and Ms. Motta would have to be wearing blinders not to have seen this), APA Exhibit 1.5 was on its face intended to reflect a purchase price for Walgreen accounts receivable that was separate and apart from any Walgreen chargebacks, which were not relevant to the parties' calculations therefor (although the parties knew that it was likely that Walgreen would assert significant chargebacks).  See generally Tr. 745-46, 804-06, 811.

Secondly, NPI has asserted a claim against NXXI under APA ¶ 2.14 only with respect to AJR, and, as noted above, it has no damages with respect to AJR because, given HPF's actions, NPI was not required to take any AJR product back, Tr. at 691, and, as discussed above, Ex. 114 does not substantiate a claim for unsalable AJR inventory.[65]

---

[64] See also APA ¶¶ 2.18, 4.4, 6.1, 6.3, which bring down of all representations and warranties to the closing date.  NPI has not argued that its obligation under APA ¶ 1.3(a) of the APA is excused by NXXI's asserted breaches, and any such argument is problematic, in any event.  NPI never sought to rescind the APA, which had ongoing performance provisions (APA Art. 9), leaving it with a claim, at best, for partial breach, not the right to stop performance. Miami Beach v. Carner, 579 So. 2d 248, 252 (Fla. Dist. Ct. App. 1991).

[65] It is also clear that NPI had substantial information before the signing of the APA regarding NXXI's distressed financial and operational condition and history of massive chargebacks (including from Walgreen) and nevertheless determined not to pursue those issues with further due diligence, although it had a right to do so. Tr. at 692 (NPI aware Walgreen had placed NXXI on payment hold and that in prior fiscal year had taken approximately $1.5 million in deductions against NXXI), 726-27(NPI aware that NXXI had significant slow moving and potentially obsolete inventory and significant receivables over 90 days old). See also id. at 794 (NPI knew of "dramatic issues" regarding reduced sales before signing the APA). NPI decided, instead, to renegotiate the APA. Id. at 730-31, 734, 738-40.  Whether such knowledge (and, perhaps, imputed waiver) ultimately would be relevant to all of NPI's breach claims and vitiate the representations and warranties set forth in APA ¶¶ 2.10, 2.11, 2.13, and 2.18, compare S. Broad. Gp., LLC v. Gem Broad., Inc., 145 F. Supp. 2d 1316, 1324 (M.D. Fla. 2001), aff'd 49 Fed. Appx. 288 (11th Cir. 2002) and Hobco, Inc. v. Tallahassee Assocs., 807 F.2d 1529, 1533 (11th Cir. 1987); see generally Charles K. Whitehead, Sandbagging: Default Rules and Acquisition Agreements, 2011 Del. J.

## Conclusion

For the foregoing reasons, after netting the parties' claims against each other, (a) NXXI has a claim against Walgreen for $401,684.98 and a claim against NPI for $155,445.10, and (b) Walgreen has a claim against NPI for $178,690.18 ($1,297,172.02 minus $908,763.96 (NPI's claim against Walgreen) minus $209,717.88 (NXXI's accounts receivable from Walgreen purchased by NPI under the APA), plus, in each case, (a) pre-judgment interest under Florida law from the date of breach, that is, the date the respective party failed to pay the receivable or chargeback,[66] and (b) post-judgment interest at the federal rate in effect on the date of this Memorandum of Decision.  Counsel for NXXI shall email a proposed judgment to chambers consistent with this Memorandum of Decision.


Dated:  May 29, 2014
         White Plains, New York


                                        /s/Robert D. Drain
                                         United States Bankruptcy Judge

---

Corp. L. 1081 (2011); Sidney Kwestel, Express Warranty as Contractual -- The Need for a Clear Approach, 53 Mercer L. Rev. 557 (2002), need not be decided in light of the Court's other holdings.
    [66] Argonaut Ins. Co. v. May Plumbing Co., 474 So. 2d 212, 215 (Fla. 1984); Capital Envtl. Servs. v. Earth Tech., Inc., 25 So. 3d at 597.